IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| RODNEY P., ) <br><br> Plaintiff, ) <br><br> v. ) <br><br> MARTIN O'MALLEY,[1] ) <br> Commissioner of Social Security, ) <br><br> Defendant. ) | Case No. 2:22cv471 |

## REPORT AND RECOMMENDATION

Plaintiff Rodney P. ("Plaintiff") filed this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of Defendant Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration ("the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB") under the Social Security Act. This action was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. §§ 636(b)(1)(B)–(C), Federal Rule of Civil Procedure 72(b), Eastern District of Virginia Local Civil Rule 72, and the April 2, 2002, Standing Order on Assignment of Certain Matters to United States Magistrate Judges. ECF No. 7.

Presently before the Court is Plaintiff's Motion for Summary Judgment, ECF No. 12, and the Commissioner's Brief in Support of the Commissioner's Decision Denying Benefits and in Opposition to Plaintiff's Motion for Summary Judgment, ECF No. 16. After reviewing the briefs, the undersigned makes this recommendation without a hearing pursuant to Federal Rule of Civil

---

[1] On December 20, 2023, Martin O'Malley became the Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Commissioner Martin O'Malley for former Acting Commissioner Kilolo Kijakazi in this matter.

Procedure 78(b) and Eastern District of Virginia Local Civil Rule 7(J). For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 12, be **DENIED**, the final decision of the Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## I. PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for DIB on April 2, 2019, alleging disability due to bipolar disorder, high blood pressure, and blindness in his right eye. R. at 116–17.[2] Plaintiff's application was initially denied on October 10, 2019, and again denied upon reconsideration on December 18, 2020. R. at 115, 131. On February 4, 2021, Plaintiff requested a hearing before an administrative law judge. R. at 179.

A hearing was held on March 9, 2022, at which Plaintiff appeared with counsel before Administrative Law Judge William Pflugrath ("the ALJ"). R. at 34–77. Both Plaintiff and an impartial vocational expert testified at the hearing. R. at 40–77. On April 4, 2022, the ALJ issued a decision finding Plaintiff not disabled. R. at 15–28. Plaintiff filed a request with the Appeals Council to reconsider the ALJ's decision, which was denied on September 30, 2022, making the ALJ's decision the final decision of the Commissioner. R. at 1–3.

Having exhausted his administrative remedies, on November 8, 2022, Plaintiff filed a Complaint for judicial review of the Commissioner's decision. ECF No. 1. On March 27, 2023, Plaintiff filed a motion for summary judgment and accompanying memorandum in support. ECF Nos. 12–13. On May 10, 2023, the Commissioner filed an opposition to Plaintiff's motion for summary judgment and brief in support of the Commissioner's decision denying benefits. ECF

---

[2] "R." refers to the certified administrative record that was filed under seal on February 2, 2023, pursuant to Eastern District of Virginia Local Civil Rules 5(B) and 7(C)(1). ECF No. 6.

No. 16.  Plaintiff did not file a reply.  Because the matter is fully briefed, it is now ripe for recommended disposition.

## II.  RELEVANT FACTUAL BACKGROUND

The Record included the following factual background for the ALJ to review:

Plaintiff was fifty years old at the time of his alleged disability onset date of March 11, 2019.  R. at 117.  Plaintiff lives with his wife and three children.  R. at 41.  He completed four years of trade school, specializing in business.  R. at 42.  He last worked as a radiation monitor in the shipbuilding industry.  R. at 42.

### A.  Plaintiff's Medical Records Relevant to Alleged Mental Impairments[3]

In March 2019, Plaintiff  presented to Family Nurse Practitioner Katia Hall ("FNP Hall") at Alpha Psychiatric Services to establish care.  R. at 458.  He explained that he was diagnosed with bipolar disorder when he was eighteen and has been taking Lithium for over thirty years.  R. at 458.  Plaintiff reported low energy, anxiety, difficulty concentrating, insomnia, irritability, and trouble sleeping.  R. at 458.  He was missing three to four days of work per week and not sleeping well.  R. at 458.  Plaintiff stated he wanted to go "natural" and began taking black seed oil in place of Lithium.[4]  R. at 458.  FNP Hall decided to taper Plaintiff off Lithium over a period of four weeks, and gradually increase Plaintiff's prescription of Trileptal.[5]  R. at 460.  FNP Hall filled out a medical leave form for Plaintiff stating that he "will be going under extreme medication change" and would be unable to work for two months.  R. at 463.  At his follow-up appointment two weeks

---

[3] Because Plaintiff's physical impairments are not at issue, the Court does not address Plaintiff's medical records relating to his physical impairments.
[4] Lithium is used to treat bipolar disorder.  *Lithium (Oral Route)*, Mayo Clinic (Jan. 1, 2024), https://www.mayoclinic.org/drugs-supplements/lithium-oral-route/side-effects/drg-20064603?p=1.
[5] Trileptal, the brand name of Oxcarbazepine, is used to control partial seizures.  *Oxcarbazepine (Oral Route)*, Mayo Clinic (Jan. 1, 2024), https://www.mayoclinic.org/drugs-supplements/oxcarbazepine-oral-route/description/drg-20067615.

later, Plaintiff reported feeling no side effects from the medication change, but his wife felt that he was on "defense" at all times and that he "makes things seem 'better than it usually is.'" R. at 472. At his next follow-up appointment, Plaintiff reported that his symptoms were well-controlled on his medication regime, and that he tolerated the medication change process well. R. at 476.  Shortly thereafter, Plaintiff had an emergency appointment with FNP Hall because he was feeling restless and overwhelmed.  R. at 480.  Plaintiff expressed concern about how he was going to make ends meet, and reported isolating himself from others. R. at 480.  FNP Hall prescribed Buspar, an anti-anxiety medication,[6] to add to Plaintiff's regimen.  R. at 482.

At the end of May 2019, Plaintiff reported he did not try the Buspar, and that he had been more relaxed since his disability was continued through July 16, 2019. R. at 490.  By June 20, 2019, Plaintiff had started seeing a therapist and reported he was happy with that provider.  R. at 495.  Since his last appointment in May, Plaintiff had a depressive episode that lasted two weeks. R. at 495.  He attributed it to stopping his intake of black seed oil and reported feeling better after starting that again. R. at 495.  His doctor again reported Plaintiff's symptoms were improved, did not order changes to his medications, and indicated Plaintiff should follow up in four weeks.  R. at 497.

In July and August, Plaintiff reported episodes of mania and depression lasting three to five days. R. at 499, 503.  FNP Hall increased his Trileptal prescription, and added and dropped a Vraylar[7] prescription after it proved unhelpful. R. at 503.  At his four-week follow-up in

---

[6] Buspar, or Buspirone, is used to treat certain anxiety or relieve the symptoms of anxiety. *Buspirone (Oral Route)*, Mayo Clinic (Jan. 1, 2024), https://www.mayoclinic.org/drugs-supplements/buspirone-oral-route/description/drg-20062457.

[7] Cariprazine, or Vraylar, is used to treat mania and depression related to bipolar disorder. *Cariprazine (Oral Route)*, Mayo Clinic (Dec. 1, 2023), https://www.mayoclinic.org/drugs-supplements/cariprazine-oral-route/description/drg-20152634.

September,  Plaintiff reported he had discontinued his therapy, and his depression had worsened to the point of staying in bed most days and not bathing or eating for days in a row.  R. at 507. Plaintiff had started taking Vraylar again.  R. at 507.  FNP Hall reported that Plaintiff's symptoms were "unchanged on his current medication regimen," and that Plaintiff was "visibly stressed by his inability to care for his family."  R. at 507.  At his next appointment, Plaintiff expressed frustration with finding helpful medication to mitigate his "debilitating depression," and he was concerned over losing his job.  R. at 511.

FNP Hall referred Plaintiff to Physician Assistant James Callis ("PA Callis") for a second opinion in November 2019.  R. at 598.  PA Callis reported that Plaintiff's symptoms related to bipolar disorder occured constantly and daily, and described Plaintiff's mood cycling as "rapid" and "moderate in severity."  R. at 598.  PA Callis noted Plaintiff's symptoms included the following: "anxiety, change in sleep pattern (when manic/hypomanic, depression, early awakening, easily irritated, inability to concentrate, insomnia (with mania/hypomania), memory loss, mood changes and nervousness."  R. at 599.  PA Callis ordered a psychiatric evaluation, recommended an adjustment to Plaintiff's medication, and recommended Plaintiff participate in individual therapy, counseling, and psychotherapy.  R. at 599.  At his follow-up appointment with PA Callis, Plaintiff reported that his symptoms were largely unchanged, and he presented with a depressed mood, fatigue, apathy, and amotivation.  R. at 596.  PA Callis adjusted Plaintiff's medication and discussed habits for healthier sleep.  R. at 596–97.

From January through April of 2020, Plaintiff began feeling an improvement in his symptoms.  R. at 594, 592, 590.  Although he experienced some side effects from medication including tremors, headaches, and decreased sleep, his mood swings and "manicky" symptoms decreased, and his depressive symptoms were not as severe.  R. at 592, 590.  In May 2020, Plaintiff

continued to report a depressed mood, and PA Callis noted Plaintiff was reporting inaccurate information regarding medication utility, and that he was "inconsistent" with his medication regimen. R. at 586. At his next appointment, Plaintiff reported "manic symptoms still" but "non-problematic and without racing thoughts, change in behavior, or increased activity." R. at 584. He also reported an increase in energy and no significant mania. R. at 584. PA Callis encouraged Plaintiff to consider a trial of anti-depressant medication. R. at 584.

Over the next few months, Plaintiff continued to report that he was managing his manic/hypomanic symptoms but continued to have a depressed mood and was sleeping only three to five hours per night. R. at 582, 580, 578. He also reported intermittent improvement of depressive symptoms that lasted two or three days at a time. R. at 582, 580. PA Callis expressed concern regarding Plaintiff's adherence to his medication, and recommended psychotherapy and adherence to a daily schedule. R. at 578.

After finding the appropriate medication regimen to manage Plaintiff's manic symptoms, the remainder of Plaintiff's treatment with PA Callis was dedicated to finding an appropriate treatment regimen for Plaintiff's depressive symptoms in relation to his bipolar disorder. In October and November of 2020, Plaintiff reported he was sleeping four to seven hours per night and that his manic symptoms decreased. R. at 574. However, he remained depressed and stated that he stayed in bed most days. R. at 574, 705. PA Callis encouraged Plaintiff to integrate activity such as walks and golf with his brother into his routine, and encouraged Plaintiff to take an antidepressant. R. at 574, 705. Plaintiff tried an antidepressant for two weeks but felt no positive or negative change in his symptoms. R. at 703. He expressed that financial stress contributed to his depressive symptoms, and PA Callis recommended Plaintiff address his stressors in counseling. R. at 703.

6

Beginning in 2021, Plaintiff started taking Bupropion XL[8] and an increased dose of Latuda[9], and reported his depressive symptoms improved.  R. at 699.  He also reported increased energy and activity level, reduced fatigue, spending less time in bed, and increased initiative.  R. at 699.  Upon mental status examination, PA Callis noted Plaintiff's thought content was normal, he was able to perform basic computations and apply abstract reasoning, and that Plaintiff was not experiencing hallucinations, delusions, obsessions, or homicidal/suicidal ideation.  R. at 699.  Plaintiff's mood was depressed, but he was oriented and demonstrated appropriate insight and judgment.  R. at 699.  Plaintiff's symptoms continued to improve and he reported spending less time in bed, reduced fatigue, and decreasing depressive mood.  R. at 697.  At his next appointment, Plaintiff reported a "set back" of his progress, as he experienced increased fatigue, decreased initiative, and lack of motivation.  R. at 695.  He reported staying in bed five to six times a week, and stated that he just needed to work on himself.  R. at 695.  At his following appointments, there was no change in Plaintiff's symptoms.  R. at 693, 691.  PA Callis suggested that Plaintiff consider alternative treatment, a second opinion, and evaluation for treatment resistant depression.  R. at 691.  PA Callis prescribed Plaintiff Adderall for a trial period.  R. at 691.

In May of 2021, Plaintiff experienced some improvement in his depressive symptoms, and reported "feeling better some days."  R. at 689.  However, his improvement did not last long, and in June of 2021, Plaintiff reported no observable increase in his energy, motivation, or initiative, and reported difficulty getting out of bed and caring for his personal hygiene.  R. at 687.  Plaintiff's stopped taking Adderall because his insurance would not allow an ongoing Adderall trial.  R. at

---

[8] Bupropion XL, or Wellbutrin XL, is used to treat depression. *Bupropion (Oral Route)*, Mayo Clinic (Nov. 1, 2023), https://www.mayoclinic.org/drugs-supplements/bupropion-oral-route/side-effects/drg-20062478?p=1.

[9] Latuda, or Lurasidone, is used to treat depression caused by bipolar disorder. *Lurasidone (Oral Route)*, Mayo Clinic (Jan. 1, 2024), https://www.mayoclinic.org/drugs-supplements/lurasidone-oral-route/description/drg-20074588.

687.  In June of 2021, Plaintiff reported his symptoms appeared to be resolving, and that he was "doing good now." R. at 685.  He denied a depressed mood, and requested to continue his current medication regimen. R. at 685.  At his next appointment in September of 2021, Plaintiff's spouse told PA Callis that Plaintiff's symptoms had not actually improved at the time of his last appointment as Plaintiff had reported. R. at 683.  Plaintiff reported at the current appointment he had a "relapse" in his symptoms and was continuing to stay in bed with decreased energy. R. at 683.  PA Callis decided to refer Plaintiff out for treatment "due to lack of progress in 2 years despite outside consultation and multiple trials and failures of medication in addition to medical ethics." R. at 683.

Plaintiff presented to Dr. Eddie Smith on December 13, 2021, and requested a refill of his prescriptions. R. at 738.  Dr. Smith noted Plaintiff was positive for depression, but negative for hallucinations and memory loss, he was not anxious, and he did not suffer from insomnia. R. at 739.  Plaintiff's psychiatric exam noted his mood, behavior, thought content, and judgment were all normal. R. at 740.  In January of 2022, Angela Allen, PMHNP-BC, FNP BC ("FNP Allen") evaluated Plaintiff. R. at 747.  Plaintiff reported he felt sadness, anxiety, fatigue, isolation, decreased interests, and irritability. R. at 748.  He felt that his medication adequately managed his "manicky" symptoms but did not adequately address his depressive symptoms. R. at 749.  Plaintiff denied any difficulty concentrating or insomnia. R. at 750.  Upon examination, Plaintiff had logical thought processes, good judgment, and insight, but his mood was depressed, and his affect was dysthymic. R. at 750.

**B. Relevant Mental Evaluations Completed by State Agency Examiners**

At both the initial review on October 10, 2019, and the reconsideration review on December 18, 2020, state agency examiners determined Plaintiff had moderate limitations on his

mental residual functional capacity.  R. at 127–28, 149–52.  Specifically, Plaintiff was moderately limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; respond appropriately to changes in the work setting; complete a normal workday and workweek without interruptions from psychologically based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods.  R. at 127–28, 149–51.  Still, both examiners determined

> [Plaintiff] would be limited due to his symptoms of depression, but mental status exams consistently show that his attention/concentration are intact, he has no evidence of memory impairment and his thought processes/content are intact, all of which supports his ability to complete a normal workday or workweek [with]out interruptions from psychologically based [sic] symptoms and perform at a consistent pace [without] an unreasonable number and length of breaks.

R. at 127, 150.  Both examiners also determined Plaintiff had no limitations related to his understanding, memory, or social interactions.  R. at 127, 149–51.

### C.  Relevant Medical Opinions

In March 2019, FNP Hall completed a mental status evaluation of Plaintiff.  R. at 440.  She reported: "[w]hen [Plaintiff] has his lows he is unable to get out of the bed"; he "[i]solates himself"; he is "[u]nable to sleep or eat"; and he has "[n]o energy."  R. at 440.  FNP Hall further noted Plaintiff's mood was sad, memory was fair, thoughts were scattered, attention span was fair, abstract reasoning was poor, and judgment was fair.  R. at 441–42.  She reported Plaintiff's ability to adapt behaviors under stress was worsening, and "due to the worsening of his condition he can no longer work. He is unstable."  R. at 443.  Later in June and July, FNP Hall authored letters stating that Plaintiff would not be able to work for the next twelve months, and recommended he be put on long-term disability.  R. at 437–38. In December of 2019, FNP Hall completed a form medical source statement, and found that Plaintiff had extreme impairments in his abilities to: carry out short/simple instructions; maintain concentration/focus; get along with the general public,

9

coworkers, and supervisors; perform at a consistent pace; respond to changes in routine; and deal with normal work stress. R. at 515.

Plaintiff's counselor, Licensed Professional Counselor Michael Johnson ("LPC Johnson"), along with Portia Rawles, PsyD ("Dr. Rawles"), completed a mental status evaluation form in September 2019.[10]  Therein, they noted that during his depressive episodes, Plaintiff isolated himself in his bedroom and experienced a lack of energy. R. at 450. On his non-depressive days, he would run and manage a small business, perform his duties as a pastor, and perform yard work and chores around the house. R. at 450. As for his current mental status, they noted: Plaintiff clearly conveyed his thoughts; maintained a clean appearance; was oriented to person, time and place; his mood varied from depressed to excited; his memory appeared to be intact; and his thought content was always congruent; he displayed no negative attention span or concentration; he had normal abstract reasoning; he displayed normal judgment pattern; his adaptive behaviors were not deteriorating; and he did not have cognitive deficits. R. at 451–52. In December 2019, LPC Johnson completed a medical source statement and found that Plaintiff had mild impairments in his abilities to maintain concentration/focus, and get along with the general public, coworkers, and supervisors. R. at 516. He also found that Plaintiff had moderate impairments in his abilities to: carry out short/simple instructions; perform at a consistent pace; respond to changes in routine; and deal with normal work stress. R. at 516. One month later, LPC Johnson completed a mental status exam form, noting that Plaintiff presented with a depressed mood, and reported difficulty managing attention and concentration, and his insight was hampered due to depressive thoughts.

[10] There are no treatment notes from LPC Johnson in the record.  However, in a letter authored in May 2020, LPC Johnson noted Plaintiff began treatment at Rawles Psychological Services on June 11, 2019, but had a break in service from August 6, 2019, to December 10, 2019. R. at 545.

R. at 548.  LPC Johnson also noted that Plaintiff was oriented, his short-term memory was intact, and that he had a good memory recall of learned information.  R. at 548.

### D. Plaintiff's Testimony at ALJ Hearing

At the ALJ hearing, Plaintiff testified that he attends church and is a pastor of a small congregation.  R. at 51–52.  On his bad days, Plaintiff explained he isolates himself and does not want to get out of bed or eat.  R. at 55.  He testified he has bad days about five days a week.  R. at 55.  On his good days, Plaintiff explained he helps out around the house.  R. at 56.  He takes his daughter to school every morning and occasionally attends his daughter's basketball games.  R. at 56–57.  Plaintiff explained that after he was terminated from his job in March of 2020, his depressive symptoms worsened.  R. at 63.

Plaintiff discussed how he helps with a bread business that he and his wife run.  Plaintiff testified that he assists his wife in their bread business by receiving orders and helping to distribute orders.  R. at 48–49.  Plaintiff explained that he felt his depressive symptoms lower his confidence such that he cannot perform other work.  R. at 50.  He explained that even on his bad days, he is motivated to deliver bread because it will bring money.  R. at 60.

### III. THE ALJ'S DECISION

To determine if the claimant is eligible for benefits, the ALJ conducts a five-step sequential evaluation process.  20 C.F.R. § 404.1520; *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015) (summarizing the five-step sequential evaluation).  At step one, the ALJ considers whether the claimant has worked since the alleged onset date, and if so, whether that work constitutes substantial gainful activity.  § 404.1520(a)(4)(i).  At step two, the ALJ considers whether the claimant has a severe physical or mental impairment that meets the duration requirement.  § 404.1520(a)(4)(ii).  At step three, the ALJ determines whether the claimant has an impairment that

meets or equals the severity of a listed impairment set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  § 404.1520(a)(4)(iii).  If the claimant does not have an impairment that meets or equals the severity of a listed impairment, the ALJ will determine the claimant's residual functional capacity, that is, the most the claimant can do despite her impairments.  § 404.1545(a).  At step four, the ALJ considers whether the claimant can still perform past relevant work given his or her residual functional capacity.  § 404.1520(a)(4)(iv).  Finally, at step five, the ALJ considers whether the claimant can perform other work.  § 404.1520(a)(4)(v).

The ALJ will determine the claimant is not disabled if: they have engaged in substantial gainful activity at step one; they do not have any severe impairments at step two; or if the claimant can perform past relevant work at step four.  *See Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014).  The ALJ will determine the claimant is disabled if the claimant's impairment meets the severity of a listed impairment at step three, or if the claimant cannot perform other work at step five.  *Id.*; *see also Mascio*, 780 F.3d at 634–35 (noting the ALJ will only determine the claimant's residual functional capacity if the first three steps do not determine disability).

Under this sequential analysis, the ALJ made the following findings of fact and conclusions of law:

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of March 11, 2019. R. at 17.  At step two, the ALJ found that Plaintiff had the following severe impairments: optic nerve atrophy in the right eye and bipolar disorder. R. at 17.  At step three, the ALJ considered Plaintiff's severe impairments and found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  R. at

18–19.

After step three, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform medium exertional level work, with the following limitations:

> [Plaintiff] is limited to jobs that do not require bilateral visual acuity. He can tolerate occasional exposure to workplace hazards such as unprotected heights or dangerous machinery. He is capable of simple, repetitive, and routine tasks. He can perform non-production paced tasks as to tempo and capacity (i.e., non-assembly line work). He can maintain a persistent effort on only routine tasks. He can tolerate occasional changes in tasks or work setting. He can make routine, work-related decisions.

R. at 19. In making this determination, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSR 16-3p." R. at 19.

At step four, the ALJ determined that Plaintiff was incapable of performing his past relevant work as a radiological control technician/monitor, which is considered light exertional level, skilled work. R. at 26. While Plaintiff cannot resume his prior employment, the ALJ determined at step five that Plaintiff could perform other jobs that exist in significant numbers in the national economy. R. at 26–27. Thus, the ALJ determined that Plaintiff was not disabled from the alleged onset date, March 11, 2019, through the date of his decision, April 4, 2022. R. at 27–28.

## IV. **STANDARD OF REVIEW**

Under the Social Security Act, the Court's review of the Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "evidence as a reasonable mind might accept as adequate to support a conclusion." *Craig v. Chater*, 76 F.3d

585, 589 (4th Cir. 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "It consists

of 'more than a mere scintilla of evidence but may be somewhat less than a preponderance.'" *Britt*

*v. Saul*, 860 F. App'x 256, 260 (4th Cir. 2021) (quoting *Craig*, 76 F.3d at 589).  The Court looks

for an "accurate and logical bridge" between the evidence and the ALJ's conclusions.  *Woods v.*

*Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018); *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016);

*Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015).

   In determining whether the Commissioner's decision is supported by substantial evidence,

the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute

our judgment for that of the [Commissioner]."  *Craig*, 76 F.3d at 589.  If "conflicting evidence

allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that

decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)."  *Id.* (quoting

*Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).  Accordingly, if the Commissioner's denial

of benefits is supported by substantial evidence and applies the correct legal standard, the Court

must affirm the Commissioner's final decision.  *Hays*, 907 F.2d at 1456.

## V. ANALYSIS

   Plaintiff's appeal to this Court raises two challenges to the ALJ's decision.  First, Plaintiff

alleges that the ALJ erred by failing to acknowledge and weigh certain mental health treatment

evidence.  ECF No. 13 at 5–7.  Second, Plaintiff argues that the ALJ improperly relied on a lack

of objective evidence to evaluate Plaintiff's subjective complaints related to bipolar disorder.  *Id.* at

7–9. The Court will address each argument in turn.

### A.  The ALJ Properly Acknowledged and Weighed Plaintiff's Mental Health Treatment Records.

   Plaintiff argues that the ALJ did not properly discuss or weigh his neuropsychiatric exam

findings since May 12, 2020, which reveal depressed mood and affect.  ECF No. 13 at 6.  Plaintiff

contends that the ALJ was required to discuss these records because they rebut "the ALJ's depiction of [Plaintiff] as being stable, doing well, and improving." *Id.* at 7. Plaintiff further distinguishes between neurologic mental health exam findings such normal mood and affect, which he concedes the ALJ discussed, and neuropsychiatric findings such as depressed mood and affect, which he contends the ALJ did not discuss. *Id.* at 6. In response, the Commissioner argues that the ALJ properly weighed the evidence in the record in formulating Plaintiff's RFC. ECF No. 16 at 16–20. The Commissioner notes that the ALJ dedicated a paragraph of his decision to discuss the findings that Plaintiff contends the ALJ ignored, including the medical records regarding Plaintiff's depressed mood. *Id.* at 19.

After step three of the sequential analysis, the ALJ must determine the claimant's RFC. § 404.1520(a)(4). RFC is defined as "the most" a claimant "can still do despite [his or her] limitations." § 404.1545(a)(1). In making the RFC determination, the ALJ must consider "all the relevant medical and other evidence" in the record and incorporate any impairments supported by objective medical evidence, and those impairments based on the claimant's credible complaints. § 404.1545(a)(3); *Mascio v. Colvin*, 780 F.3d 632, 635 (4th Cir. 2015) (citing SSR 96–8p, 1996 WL 374184 (July 2, 1996)). In determining the claimant's RFC, the ALJ must "identify the individual's functional limitations" and then assess the individuals "work-related abilities on a function-by-function basis," including the claimant's physical abilities, mental abilities, and any other work-related abilities affected by his or her impairments. *Mascio*, 780 F.3d at 636. The ALJ must include a "narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* The ALJ also must "build an accurate and logical bridge from the evidence to [the ALJ's] decision" in order to allow the reviewing court to evaluate the ALJ's decision. *Monroe*

*v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).

In his decision, the ALJ exhaustively reviewed Plaintiff's medical records, particularly those related to his history of care for bipolar disorder. R. at 21–22. Specifically with respect to Plaintiff's records after May 12, 2020, the ALJ states:

> [i]n May 2020, the [Plaintiff] reported manicky symptoms, as well as ongoing depression. However, he also 'reports inconsistent adherence to medication' and had not tried prescribed medication for sleep ([R. at 586]). Notes from an encounter on October 12, 2020 indicated a normal mood and affect ([R. at 622]). During a follow up on October 27, 2020, the claimant reported better managed mood swings **but continued to report unmanageable depression**. He no longer walked for exercise and stayed in bed most of the day. The provider indicated that medication compliance was 'questionable due to poor historian and non-verification by spouse' noting the [Plaintiff] had a history of non-compliance and resistance to treatment ([R. at 574]). After starting Buspar in December 2020, the [Plaintiff] reported better motivation, better mood, and decreased fatigue ([R. at 699]). In February 2021, the [Plaintiff] reported his mood continued to improve and he had better motivation ([R. at 697]). However, in March 2021, the claimant reported increased depression and fatigue, and stated he was once again spending most of the week in bed. He exhibited a depressed mood with appropriate judgment and insight. His provider increased Buspar ([R. at 695]). When the claimant returned in April 2021, he reported no change in symptoms after the medication increase, and agreed to see another provider ([R. at 693]). Thereafter, the claimant reported better mood and motivation. However, the claimant's wife indicated that this was not the case ([R. at 683, 685]).

R. at 22 (emphasis added).

Here, the ALJ sufficiently and accurately discussed Plaintiff's treatment records after May 12, 2020. The ALJ did not, as Plaintiff contends, "discuss and summarize [Plaintiff's] mental health functioning as being normal, improving, and with better mood and motivation." ECF No. 13 at 6. Rather, the ALJ noted that in May 2020 and beyond, Plaintiff reported "ongoing depression" (citing R. at 586), "unmanageable depression" (citing R. at 574), "increased depression and fatigue" (citing R. at 695), "depressed mood" (citing R. at 695), and "no change in symptoms" (citing R. at 693). R. at 22. The ALJ noted that during that time, Plaintiff did have

16

some normal mental status exams, and did have some improvement in his symptoms at times, statements that are accurately supported by the record. R. at 22; *see e.g.*, R. at 699 ("Pt. reported improving status with decreasing depressive moods . . . increasing energy and activity level"), R. at 697 ("Pt. reported continued improving status with decreasing depressive moods"). Contrary to Plaintiff's assertions that the ALJ depicted Plaintiff as "being stable, doing well, and improving," ECF No. 13 at 7, the ALJ accurately summarized the waxing and waning of Plaintiff's depressive symptoms noted in the record, and in fact provided a more fulsome discussion of the treatment notes than simple citations to neuropsychiatric exam findings. R. at 22. The ALJ discussed evidence both favorable and unfavorable to Plaintiff's claim.

Moreover, "[t]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." *Reid v. Comm'r of Soc. Soc.*, 769 F.3d 861, 865 (4th Cir. 2014). While the ALJ did not cite or discuss each individual neuropsychiatric exam finding of a depressed mood and affect that Plaintiff cites, the ALJ cited to and discussed many of the same records. *Compare* ECF No. 13 at 6 (citing R. at 586, 574, 699, 697, 695 693, 685, 683 for the proposition that the ALJ did not discuss Plaintiff's depressed mood and affect), *with* R. at 22 (citing R. at 586, 574, 699, 697, 695 693, 685, 683 to discuss Plaintiff's mental health related symptoms). Accordingly, the ALJ sufficiently and accurately discussed Plaintiff's treatment records related to his mental health symptoms, and remand is not warranted on this ground.

**B. The ALJ Properly Evaluated Plaintiff's Subjective Symptoms Related to Bipolar Disorder.**

Second, Plaintiff argues that the ALJ improperly relied on a lack of objective evidence to evaluate Plaintiff's subjective complaints related to bipolar disorder. ECF No. 13 at 7–9. Plaintiff contends that consistent with *Arakas v. Commissioner of Social Security* and *Shelley C. v. Commissioner of Social Security*, the ALJ was not permitted to rely upon a lack of objective

evidence of bipolar disease to prove the severity, persistence, and limiting effects of Plaintiff's symptoms. *Id.* (citing *Arakas*, 983 F.3d 83 (4th Cir. 2020) and *Shelley C.*, 61 F.4th 341 (4th Cir. 2023)). In response, the Commissioner argues that the ALJ did not rely upon a lack of objective evidence to prove the severity, persistence, and limiting effects of Plaintiff's symptoms, and that the ALJ properly discounted Plaintiff's subjective complaints because they were inconsistent with medical findings, Plaintiff's activities of daily living, and findings by state agency psychologists. ECF No. 16 at 20–24. The Commissioner maintains that the ALJ did not violate the Fourth Circuit's rulings in *Arakas* or *Shelley C.* in evaluating Plaintiff's subjective symptoms. *Id.*

To evaluate a claimant's subjective complaints in the context of an RFC determination, the ALJ must conduct a two-step analysis. *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020); § 404.1529(a). At step one, the ALJ must determine "whether objective medical evidence presents a 'medically determinable impairment' that could reasonably be expected to produce the claimant's alleged symptoms." *Id.* (citing § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3). At step two, the ALJ must evaluate the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and perform basic work activities. *Id.* (citing § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4). To evaluate the individual's symptoms, the ALJ looks to whether Plaintiff's subjective complaints could "reasonably be accepted as consistent with the objective medical evidence and other evidence." *Craig*, 76 F.3d at 595. However, the ALJ cannot "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. *Arakas*, 983 F.3d at 95 (citing SSR 16-3p, 2016 WL 1119029 at *5) (internal quotation omitted); *Walker v. Bowen*, 889 F.2d 49, 49 (4th Cir. 1989) ("there need not be objective evidence of the pain itself or the intensity"). Because symptoms

18

cannot always be measured objectively through clinical or laboratory diagnostic techniques, at step two, the ALJ must consider the entire case record to assess the limiting effects of the individual's symptoms. *Arakas*, 983 F.3d at 95.

Here, the ALJ sufficiently evaluated Plaintiff's subjective complaints regarding his pain. First, the ALJ discussed the medical record and concluded pursuant to step one of the analysis that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms. R. at 25. Pursuant to step two of the analysis, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. at 25. The ALJ noted he accorded "appropriate deference" to Plaintiff's subjective complaints, and that despite Plaintiff's limitations, there are jobs that Plaintiff could perform. R. at 25. In making his conclusions, the ALJ provided the following explanation:

> the [RFC] assessment accords some deference to the [Plaintiff's] description of symptoms, despite the record of conservative treatment. While records indicate 'unmanageable' depression, the [Plaintiff] has not sought inpatient care or crisis stabilization since March 2019. The medical evidence of record does not support the full extent of the [Plaintiff's] subjective complaints, and the allegation that he cannot work is diminished because it is inconsistent with the record.

R. at 25–26. Further, in discussing Plaintiff's RFC limitations, the ALJ explained that Plaintiff:

> suffers from bipolar disorder where depression affects his motivation to perform daily activities and remain on task. In light of this…I have factored the [Plaintiff's] moderate limitations in concentration, persistence, and pace into the [RFC] above by finding the [Plaintiff] capable of performing simple tasks. The [Plaintiff] may experience deficits in concentration and persistence as a result of depressed mood, so a provision for simple, repetitive and routine tasks reduces the need for prolonged focus that is typically entailed in detailed or complex tasks. I have also provided limitations for routine decisions in a non-production setting, in an effort to reduce sources of stress that could inhibit the [Plaintiff's] ability to remain on task. I also find that he can tolerate changes in the work setting on an occasional basis, which accommodates any difficulties with focus necessary to master new tasks or adapt to new situations.

R. at 24.

In this case, the ALJ properly evaluated Plaintiff's subjective complaints by determining that Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's symptoms, evaluating the intensity, persistence, and limiting effects of those symptoms, and concluding that Plaintiff would be able to perform jobs within his RFC limitations. R. at 25–26. The ALJ did not, as Plaintiff contends, rely on a lack of subjective evidence to discount Plaintiff's subjective complaints of pain and functional limitations.[11] Rather, the ALJ credited Plaintiff's subjective complaints related to his depressive symptoms stemming from bipolar disorder, and incorporated RFC limitations to accommodate Plaintiff's subjective complaints. Accordingly, the ALJ did not err in evaluating Plaintiff's subjective complaints.

## VI. **RECOMMENDATION**

Because substantial evidence supports the Commissioner's decision and the correct legal standard was applied, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 12, be **DENIED**, the final decision of the Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## VII. **REVIEW PROCEDURE**

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is forwarded to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure

---

[11] Plaintiff does not point to *any* language in the ALJ's decision to form the basis of his argument that the ALJ considered a lack of objective medical evidence to discount Plaintiff's subjective complaints. *See* ECF No. 13 at 7–9.

Rule 6(a). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2. A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to the counsel of record for Plaintiff and the Commissioner.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
January 31, 2024